# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 11-3272

STEVEN M. ROMANOWSKY, APPELLANT,

V.

ERIC K. SHINSEKI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Decided July 10, 2013)

*Katy S. Clemens* and *Barton F. Stichman* of Washington, D.C., were on the brief for the appellant.

*Will A. Gunn*, General Counsel, *R. Randall Campbell*, Assistant General Counsel, *Joan E. Moriarty*, Deputy Assistant General Counsel, *Jelani A. Freeman*, and *Mark D. Gore*, all of Washington, D.C., were on the brief for the appellee.

Before MOORMAN, SCHOELEN and GREENBERG, *Judges*.

GREENBERG, *Judge*: The appellant, Steven M. Romanowsky, appeals through counsel a July 5, 2011, Board of Veterans' Appeals (Board) decision that denied him benefits based on service connection for a psychiatric disorder claimed as an adjustment disorder.[1] Record (R.) at 3-7. On

---

[1] *Dorland's Illustrated Medical Dictionary* defines "adjustment disorder" as "a maladaptive reaction to identifiable stressful life events, such as divorce, loss of job, physical illness, or natural disaster; this diagnosis assumes that the condition will remit when the stress ceases or when the patient adapts to the situation." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 547 (32d ed. 2012).

*The Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) defines "adjustment disorder" as

a psychological response to an identifiable stressor or stressors that results in the development of clinically significant emotional or behavioral symptoms . . . [t]he clinical significance of the reaction is indicated either by marked distress that is in excess of what would be expected given the nature of the stressor or by significant impairment in social or occupational (academic) functioning. . . . By definition, an Adjustment Disorder must resolve within 6 months of the termination of the stressor (or its consequences). . . . However, the symptoms may persist for a prolonged period (i.e., longer than 6 months) if they occur in response to a chronic stressor (e.g., a chronic, disabling general medical

May 9, 2013, the Court issued a decision vacating the July 5, 2011, Board decision and remanding the matter for further development and proceedings. On May 30, 2013, the Secretary filed a motion for reconsideration, arguing in part that the Court "impermissibly usurped the Board's discretion to seek additional record development." Secretary's Motion at 1. To clarify its decision, the Court will grant the Secretary's motion for reconsideration, withdraw the May 9, 2013, opinion, and issue this opinion in its stead.

The Court has jurisdiction to review the Board's decision pursuant to 38 U.S.C. § 7252(a). For the following reasons, the Court will vacate the Board's July 2011 decision and remand the appellant's claim for further development and readjudication consistent with this opinion.

## I. BACKGROUND

The appellant served on active duty in the U.S. Navy from May 1995 to May 1999 at Oceana Naval Air Station in Virginia Beach, Virginia, as a systems organizational apprentice maintenance technician. R. at 442. Thereafter, he joined the U.S. Air Force and served on active duty from November 2002 to October 2008, including overseas service at Spangdahlem Air Base in Germany,

---

condition) or to a stressor that has enduring consequences (e.g., the financial and emotional difficulties resulting from a divorce).

DSM-IV-TR 679 (4th ed. Text Revision 2000).

*Stedman's Medical Dictionary* defines "adjustment disorder" as

(1) a group of mental and behavior disorders in which the development of symptoms is related to the presence of some environmental stressor or life event and is expected to remit when the stress ceases; (2) a disorder the essential feature of which is a maladaptive reaction to an identifiable psychological stress, or stressors, that occurs within weeks of the onset of the stressors and persists for as long as 6 months . . . .

STEDMAN'S MEDICAL DICTIONARY 567 (28th ed. 2006).

"Chronic adjustment disorder" is rated as a compensable condition under 38 C.F.R. § 4.130, diagnostic code (DC) 9440. The ratings schedule for compensation contemplates a 0% rating appropriate where "[a] mental condition has been formally diagnosed, but symptoms are not severe enough either to interfere with occupational and social functioning or to require continuous medication." The schedule includes compensable ratings for "mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress;" "intermittent periods of inability to perform occupational tasks . . . due to such symptoms as: depressed mood, anxiety, suspiciousness . . ."; and occupational impairment due to "impaired judgment," "impaired impulse control," "disturbances of motivation and mood," or "difficulty in establishing and maintaining effective work and social relationships." 38 C.F.R. § 4.130, DC 9440 (2013).

2

as a utilities systems craftsman and an operations intelligence apprentice. R. at 223.

In May 2008, after nearly a decade of honorable service, the appellant's commanding officer requested a formal mental health evaluation of the appellant, citing "two counselings," "a reprimand," and a pending administrative action by his flight chief. R. at 78. Dr. Hans Conrad Philippen, Ph.D., a clinical psychologist with the 52d Medical Operations Squadron of the 52d Fighter Wing, the appellant's unit, reviewed the appellant's service documents and outpatient medical records and conducted psychological testing and a clinical interview of the appellant. R. at 79-81. After a seven-hour examination, Dr. Philippen diagnosed the appellant with a "Phase of [L]ife or Circumstance Problem," "Occupational Problem," and "Adjustment Disorder of Mixed Disturbance of Emotions and Conduct," as classified by the DSM-IV-TR. R. at 80. Dr. Philippen determined that, although the appellant did not suffer from "significant psychopathology," he demonstrated "several characteristics that may be considered incompatible with continued" active duty service in the Air Force. R. at 80. Specifically, Dr. Philippen reported that the appellant had "a high energy level that may be difficult for him to control or constructively direct," had a "higher than normal level of impulsivity," failed to "consider[] the consequences of his words," "expresse[d] himself in an exaggerated or dramatic fashion at times," was "slightly grandiose," "often frustrated," and "dissatisfied," and "expresse[d] high levels of cynicism" that were directed towards his command chain at that time. R. at 80. The psychologist further noted that the appellant's "disorder is so severe that the member's ability to function effectively in the military environment is significantly impaired making him unsuitable for military service," and that the appellant's "Top Secret clearance may represent an occupational risk at this time" because "some of his symptoms (impulsivity, emotional isolation, heightened anxiety) may compromise his reliability to handle classified information appropriately." R. at 80, 81.

Dr. Philippen stated that the appellant's condition warranted consideration for an administrative discharge. R. at 81. His evaluation and recommendations were endorsed by Major Ruth Roa-Navarrete, Mental Health Flight Commander of the 52d Fighter Wing, clinical psychologist, and officer in the Biomedical Sciences Corps of the Air Force; and Colonel Lorrie J. Cappellino, Commander of the 52d Medical Group and an Air Force Medical Corps officer. R. at 81. Later in May 2008, Dr. Philippen performed a follow-up assessment of the appellant to further

3

review the recommendations "concerning the potential revocation of [the appellant's] security clearance and considerations related to his eligibility for continued enlistment. . . ." R. at 82. During this follow-up evaluation of the appellant, Dr. Philippen concluded that the appellant was "unlikely to respond to therapeutic interventions designed to improve his overall adjustment and attitude" and stated that his recommendations from the first examination "remain as initially composed." R. at 82. Based on the command recommendation and the results of the medical examination, the appellant was found to "lack the capacity to be rehabilitated for further service" and was administratively discharged from service in October 2008 pursuant to Air Force Policy Directive 36-32 and Air Force Instruction 36-3208, paragraph 5.11.9.3, "Conditions that Interfere with Military Service: Mental Disorders–Adjustment Disorders."[2]  R. at 83.

In November 2008, the appellant filed for veterans benefits based on service connection for an adjustment disorder. R. at 63-76. Shortly after discharge, he received a December 2008 VA examination that found he had "difficulty trusting people due to the military experience," "often '[did] not feel happy,'" and experienced "decreased motivation" post-service. R. at 49-51. The examiner noted the previous diagnosis that "found [the appellant] to have an adjustment disorder and deemed [him] unsuitable for military service." R. at 49. Without further addressing his previous diagnosis, the examiner determined that the appellant's decreased motivation and problems trusting people were "normal issues that individuals go through." R. at 49, 51. The examiner ultimately found that "[t]he veteran also keeps in touch with friends from the military, thus overall the veteran is not displaying any significant impairment in social and/or occupational functioning," and did not diagnose him with an adjustment disorder. R. at 48-52.

In January 2009, the Newark, New Jersey, VA regional office (RO) denied service connection for an adjustment disorder because "the medical evidence of record fails to show that this disability has been clinically diagnosed." R. at 45. The appellant filed a Notice of Disagreement with the decision in February 2009. R. at 41. In October 2009, the RO issued a Statement of the

_____

[2]The Court lacks jurisdiction to review the department's determinations concerning the appellant's administrative discharge, which was executed without Medical Evaluation Board review. To the extent that the appellant believes that any aspect of his discharge was erroneous, the appellant's remedy for errors committed by the Air Force lies with the Air Force Board of Correction of Military Records. 10 U.S.C. § 1552(a) ("The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error to remove an injustice.").

Case that provided a single paragraph explanation for its decision, stating that "[w]e denied service connection . . . because the medical evidence of record fails to show that a chronic psychiatric disorder has been clinically diagnosed," and that "[a]lthough service medical records note an adjustment disorder this must be considered acute and transitory" because the VA examiner "indicated that a formal mental health diagnosis was not found." R. at 37. The appellant appealed to the Board in October 2009 and his American Legion representative submitted a written brief to the Board in September 2010, stating that it was "unclear how the veteran could have experienced such a reversal in psychological health" and arguing that the appellant should be given the benefit of the doubt because the evidence was in equipoise. R. at 11-13.

On July 5, 2011, the Board issued a decision denying the appellant's claim. R. at 3-7. The Board, relying on the December 2008 VA mental health examination, found that the appellant did not have a current diagnosis of a mental disorder, that "the [v]eteran's service connection claim was received in November 2008," and that "[a]s the sole May 2008 diagnosis falls outside the claim period, there is no current disability for service connection purposes." R. at 7 (citing *McClain v. Nicholson*, 21 Vet.App. 319 (2007)). The Board found that "the requirement of competent medical evidence of a current disability has not been met as to this claim" and concluded that a preponderance of the evidence weighed against entitlement to service connection for an adjustment disorder. R. at 7. The Board did not consider whether the appellant's adjustment disorder, as diagnosed in May 2008, was extant at the time he filed his claim but had resolved by the time of the December 2008 examination. *See McClain,* 21 Vet.App. at 321 (noting that the "current disability" required for service connection includes a disability at the time of filing or during the pendency of a claim); *but see Brammer v. Derwinski*, 3 Vet.App. 223, 225 (1992) (stating that "simply because [the veteran] had a disease or injury while on active service" was insufficient to obtain benefits "[i]n the absence of proof of a present disability").

## II. ANALYSIS

### A. Erroneous Exclusion of Evidence

The Board erred when it denied the appellant's claim of entitlement to benefits based on service connection for an adjustment disorder on the grounds that the appellant did not have a current

disability when he filed his claim or at any time during the pendency of his claim. R. at 7. Although the Board correctly noted that an appellant must have a current disability at the time he or she filed his or her claim, *see Degmetich v. Brown*, 104 F.3d 1328, 1330-33 (Fed. Cir. 1997), the Board failed to consider that a claimant satisfies the current disability threshold when a disability *exists at the time his or her claim was filed*, even if the disability resolves prior to the Secretary's adjudication of the claim. *McClain,* 21 Vet.App. at 321.

Establishing service connection generally requires medical or, in certain circumstances, lay evidence of (1) a current disability; (2) an in-service incurrence or aggravation of a disease or injury; and (3) a nexus between the claimed in-service disease or injury and the present disability. *See Davidson v. Shinseki*, 581 F.3d 1313 (Fed. Cir. 2009); *Hickson v. West*, 12 Vet.App. 247, 253 (1999); *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table); *see also Heuer v. Brown*, 7 Vet.App. 379, 384 (1995).

In determining that the appellant had not shown that he suffered from a current disability at the time he filed his claim, the Board refused to consider the May 2008 diagnosis of the appellant's adjustment disorder. R. at 7. The Board did so because it inaccurately interpreted *McClain* to exclude the appellant's May 2008 examination from consideration as evidence of a current disability. R. at 7. This view of *McClain* is flawed. Contrary to the Board's interpretation, *McClain* does not prohibit evidence predating the filing of a claim from establishing a current disability for purposes of establishing service connection.

The appellant in *McClain* filed for benefits in 1994, and was diagnosed with depression by examinations in 1995 and 1997. 21 Vet.App. at 319. The Board relied on a 2003 examination when finding that the appellant's depression had resolved and declined to award benefits based on service connection. *Id*. The Court concluded that the only permissible interpretation of the Board's decision, and the examinations postdating the filing of the claim, was that the appellant's depression resolved itself during the processing of the claim. *Id*. However, the Court concluded that the Board erred in denying service connection on the grounds that the appellant did not manifest a disability at the time the Board rendered its decision. *Id*. at 323. The Court reasoned that, because the appellant had depression at some point during the processing of his claim, he had a current disability manifested during the pendency of his claim that may have been service connected. Specifically, the Court

stated that the requirement of a current disability "is satisfied when a claimant has a disability at the time a claim for VA disability compensation is filed or during the pendency of that claim and that a claimant may be granted service connection even though the disability resolves prior to the Secretary's adjudication of the claim." *Id*. at 321. Accordingly, the Court reversed the Board's decision and remanded the claim for further adjudication, to include the consideration of whether "staged ratings" were appropriate under *Fenderson v. West*, 12 Vet.App. 119 (1999).

Nowhere in *McClain* did the Court address the situation presented here, where a possible in-service diagnosis was followed shortly thereafter by the appellant's claim and a VA medical examiner's finding of no diagnosed disorder. *McClain* did not hold, as the Board mistakenly suggests, that where evidence of a diagnosis falls outside of the claim period, such evidence cannot establish a current disability as a matter of law. To apply the Board's misunderstanding of *McClain* in this case would permit VA to deny the existence of a disability at the time the appellant filed his claim when there was a recent doctor's diagnosis of that disability. To extend *McClain* in this fashion would also establish, incorrectly, that a report diagnosing a veteran with a disability one day before his or her filing of a claim is irrelevant to whether a current disability existed on the date of filing. Rather than ratify the Board's interpretation, the Court holds that when the record contains a recent diagnosis of disability prior to a veteran filing a claim for benefits based on that disability, the report of diagnosis is relevant evidence that the Board must address in determining whether a current disability existed at the time the claim was filed or during its pendency.[3] Because the Board incorrectly stated and applied the law when it determined that it could not consider the diagnosis of an adjustment disorder that led to the appellant's discharge from service in its determination of current disability, the Court must vacate the Board's decision and remand the matter.

B. December 2008 VA Examination

While the Court has already determined that remand is necessary, it will address the appellant's central argument on appeal: that the Board erred when it relied on the December 2008 VA examination. *See Quirin v. Shinseki*, 22 Vet.App. 390, 396 (2009) (holding that the Court may

---

[3]The Court notes that a determination that a diagnosis is sufficiently proximate to the filing of a claim so as to constitute evidence of a "current diagnosis" is a factual finding to be made by the Board in the first instance. *See Elkins v. Gober*, 229 F.3d 1369, 1377 (Fed. Cir. 2000).

address the appellant's other arguments to provide guidance on remand). The Court holds that the Board erred in relying on the December 2008 examination alone as adequate evidence upon which to make a decision. *See Nolen v. Gober*, 14 Vet.App. 183, 184 (2000) (Board determination as to whether the Secretary fulfilled his duty to assist is a finding of fact subject to review under the "clearly erroneous" standard prescribed by 38 U.S.C. § 7261(a)(4)); *see also United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948) (holding that a finding of material fact is "clearly erroneous" when a court, after reviewing all the evidence, "is left with the definite and firm conviction that a mistake has been committed"). For the Board to rely on a medical opinion, the opinion must be "based upon consideration of the veteran's prior medical history and examinations," must "describe[] the disability, if any, in sufficient detail so that the Board's 'evaluation of the claimed disability will be a fully informed one,'" and must "support its conclusion with an analysis that the Board can consider and weigh against contrary opinions." *Stefl v. Nicholson*, 21 Vet.App. 120, 123, 124 (2007) (quoting *Ardison v. Brown*, 6 Vet.App. 405, 407 (1994).

The Court acknowledges that it is the duty of the Board to weigh the medical evidence of record. *Wood v. Derwinski*, 1 Vet.App. 190, 193 (1991). However, based on its holding here, the Court recognizes deficiencies in the medical evidence regarding whether the appellant's psychological disorder resolved itself or was incorrectly diagnosed, and whether it is acute or chronic.[4] The Board cannot make these determinations on its own without the benefit of a medical opinion to guide its judgment, and the Board erred by failing to obtain a medical opinion that would have enabled it to resolve the discrepancies between the two potentially competing medical examination reports prepared so close in time.[5] *See Colvin v. Derwinski*, 1 Vet.App. 171, 172 (1991) (holding that when the Board reaches a medical conclusion, it must base its conclusion on "independent medical evidence" rather than "provide [its] own medical judgment in the guise of a Board opinion"). Accordingly, the Board must request an additional medical opinion or clarification

---

[4] VA's schedule for rating disabilities provides ratings for a chronic adjustment disorder, but not an acute adjustment disorder. 38 C.F.R. § 4.130, DC 9440 (2013).

[5] In so concluding, the Court does not abrogate the well-settled principle, as restated in *Acevedo v. Shinseki*, 25 Vet.App. 286, 293 (2012), that "there is no reasons or bases requirement imposed on examiners." Rather, the Court recognizes that the Board may not make a medical inference unsupported by the existing medical evidence. *See Kahana v. Shinseki*, 24 Vet.App. 428, 435 (2011).

discussing the discrepancy between the two existing medical reports, given their temporal proximity, before readjudicating the appellant's claim.

## C. Remedy

Given the foregoing analysis, a discussion of the appropriate remedy for the appellant is warranted. Courts have long recognized the significance of addressing issues of veterans benefits and have consistently drawn on their judicial powers to provide effective remedies where appropriate. In *Hayburn's Case*, the United States Supreme Court noted that the New York circuit court, despite concerns noted by Chief Justice John Jay about the legality of the Invalid Pensions Act of 1792, adopted an interpretation of the act that permitted circuit court judges to hear the claims of veterans, because "the objects of this act are exceedingly benevolent, and do real honor to the humanity and justice of [C]ongress." 2 U.S. (2 Dal.) 408, 410 n., 1 L. Ed. 436 (1792).[6] When the Commissioner of Pensions failed to award benefits to a claimant whose initial denial was overturned by the Secretary of the Interior pursuant to statute, the Supreme Court considered the use of mandamus to compel the ministerial duty of making payment. *See United States ex rel. Miller v. Raum*, 135 U.S. 200, 204 (1890) (Bradley, J.); *but see United States ex rel. Dunlap v. Black*, 128 U.S. 40, 47 (1888) (Bradley, J.) (although the Supreme Court could compel action by the Commissioner of Pensions through mandamus, where the Supreme Court clearly lacked authorization to wield a power of appellate review over the Commissioner, it would not review his interpretations of law). Where Congress had foreclosed judicial review of individual veterans benefit determinations, judicial review of constitutional challenges to veterans benefits legislation was available. *See Johnson v. Robison*, 415 U.S. 361 (1974). The Court follows in this tradition, as the establishment of this Court by the Veterans' Judicial Review Act of 1988 (VJRA), 38 U.S.C. § 7251

---

[6]Under the Invalid Pensions Act of 1792, circuit courts determined whether claimants were disabled as a result of military service and submitted recommended pension amounts of these veterans to the Secretary of War. However,

> the Secretary had the power to reverse a factual determination of a circuit court and to deny what a federal court had found to be an entitlement of a claimant who had appeared before it. . . . If Congress was assigning the courts a nonjudicial function, then the law was unconstitutional. . . . The New York Circuit Court judges, confronted with the conflict between their sympathy for the veterans' needs and their opinion that they could not follow precisely Congress['s] mandate to hear the veterans' claims, decided to engage in some statutory interpretation.

Maeva Marcus & Robert Teir, *Hayburn's Case: A Misinterpretation of Precedent*, 1988 Wis. L. Rev. 527.

et seq., and the amendments to the VJRA contained in the Veterans Programs Enhancement Act, Pub. L. No. 105-368, 112 Stat. 3315, § 501 et seq., represent "Congress's understandable decision to place a thumb on the scale in the veteran's favor in the course of administrative and judicial review of VA decisions[.]" *Shinseki v. Sanders*, 556 U.S. 396, 416 (2009) (Souter, J., dissenting).

This Court has a lengthy history of deferring to the factual findings of the Board, which the Court will not disturb absent a showing of clear error. *See Owens v. Brown*, 7 Vet.App. 429, 433 (1995) ("It is the responsibility of the [Board], not this Court, to assess the credibility and weight to be given to evidence."); *see also* 38 U.S.C. § 7261(a)(4) ("in the case of a finding of material fact . . . [the Court shall] hold unlawful and set aside or reverse such finding if the finding is clearly erroneous."); *Washington v. Nicholson*, 19 Vet.App. 362, 367-68 (2005) (stating that it is the Board's, and not this Court's, duty to weigh the evidence and determine its credibility and probative value). However, this Court has the power of appellate review of Board decisions, and while "the Veterans Court's scope of review . . . is similar to that of an Article III court reviewing agency action under the Administrative Procedure Act, 5 U.S.C. § 706," *Henderson v. Shinseki*, 131 S. Ct. 1197, 1201 n. 2 (2011) (Alito, J.), the "clearly erroneous" standard applied by the Court is less deferential than the "substantial evidence" standard applied by courts when reviewing non-VA administrative adjudication. *See* R. Pierce, *Administrative Law Treatise* §§ 11.2, 11.3 (5th ed. 2010); *see also* K. Davis, *Administrative Law Treatise* § 29.5, at 353 (2d ed. 1984) ("The law has thus been deeply established that 'clearly erroneous' involves broader review than 'substantial evidence.'"). While the Court may not undertake to duplicate the role of the Board, *see Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) (the reviewing court may not reverse even if "convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently"), the Court will reverse a Board decision that is clearly erroneous when "the court is left with the definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395, as well as when the "only permissible view of the evidence is contrary to the Board's decision." *Gutierrez v. Principi*, 19 Vet.App. 1, 10 (2004).

Nevertheless, remand, not reversal, is warranted in this case because the Board's incorrect application of *McClain*, reliance on insufficient medical evidence, and failure to weigh the evidence requires remand under Court precedent. *See Tucker v. West*, 11 Vet.App. 369, 374 (1998) ("Where

the Board has incorrectly applied the law, failed to provide an adequate statement of reasons or bases for its determinations, or where the record is otherwise inadequate, a remand is the appropriate remedy."); *cf. Deloach v. Shinseki*, 704 F.3d 1370, 1380 (Fed. Cir. 2013) ("[W]here the Board has performed the necessary fact-finding and explicitly weighed the evidence, the Court of Appeals for Veterans Claims should reverse when, on the entire evidence, it is left with the definite and firm conviction that a mistake has been committed."). The Court will thus vacate the Board's decision that the appellant was not entitled to service connection for his adjustment disorder and remand for the Board to properly adjudicate the appellant's claim. The Court expects the Board to resolve the appellant's claim of service connection expeditiously and accurately once remanded.

On remand, the Board must readjudicate the appellant's claim and provide the appellant with a medical opinion resolving the discrepancies between the existing medical examinations. The Board is specifically directed to account for the evidence that the appellant was diagnosed with an adjustment disorder prior to his discharge from service for that disability. Additionally, the appellant may present, and the Board must consider, any additional evidence and argument regarding his claim. *See Kay v. Principi*, 16 Vet.App. 529, 534 (2002). As "many unfortunate and meritorious [veterans], whom [C]ongress have justly thought proper objects of immediate relief, may suffer great distress, even by a short delay, and may be utterly ruined, by a long one," *Hayburn's Case*, 2 U.S. (2 Dall.) at 410, n., the Secretary is directed to act expeditiously on remand. *See* 38 U.S.C. § 7112.

### III. CONCLUSION

The Secretary's May 30, 2013, motion for panel reconsideration is GRANTED, the May 9, 2013, panel decision is WITHDRAWN, and this decision is issued in its stead.

For the foregoing reasons, and after a review of the record, the Board's July 2011 decision denying the appellant service connection for an acquired psychiatric disorder is VACATED and the matter is REMANDED for action consistent with this decision.